UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-305-H

JASON HUMPHREY, et al.  PLAINTIFFS

V.

KIM SAPP, et al.  DEFENDANTS

**MEMORANDUM OPINION**

Jason and Kristin Humphrey brought this lawsuit alleging multiple constitutional violations and several state law tort injuries arising from the removal of their children by the Kentucky Cabinet for Health and Human Services ("the Cabinet"). In a prior Memorandum and Order (DN # 28), the Court dismissed all claims against the state, its agencies and two social workers, Kim Sapp and "Jamey" Bartley,[1] in their official capacities under the Eleventh Amendment. The only remaining defendants are Sapp and Bartley in their individual capacities (collectively referred to as "Defendants"). At this time, Defendants move to dismiss the Complaint on numerous grounds, primarily the doctrines of absolute and qualified immunity.

It is always difficult to square the application of absolute immunity in circumstances in which public officials have made misjudgments or even intentional wrongful acts. Nevertheless, these doctrines embody judgments which our Constitution, legislatures and courts have created for the overall welfare of our functioning government and society. After applying these

---

[1] Defendants tell the Court that no one named "Jamey Bartely" is employed by the Cabinet. However, an individual named "Jayne Bartley" is a social worker for the state. According to Defendant, Ms. Bartley is not Ms. Sapp's supervisor and played no role in the events underlying this action.

1

doctrines properly to our unusual circumstances, the Court concludes that, for the reasons that follow, absolute immunity bars Plaintiffs' claims against both Ms. Sapp and Ms. Bartley.

**I.**

The following description of the underlying events is drawn largely from the Findings of Fact, Conclusions of Law, and Recommended Decision of a Kentucky Administrative Law Judge ("ALJ") who heard the Humphreys's appeal of Sapp's decision to substantiate child abuse allegations against Jason Humphrey. This discussion of the facts is designed to illuminate the underlying events. As this matter is before the Court on a Rule 12(b)(6) Motion to Dismiss, the Court will base its legal conclusions on the allegations set forth in the Complaint.

On April 27, 2008, Jason Humphrey was home alone with his two young children, "M.H." and "L.H.," while his wife, Kristin, was shopping with her sister, Vickie Osborne. Jason was holding M.H., who was approximately 1 month old at the time, against his shoulder when he began warming a bottle for her. According to Jason, while he was distracted M.H. pushed against his body and fell to the floor, hitting her head against the hard linoleum. Jason immediately called Kristin and Osborne, who proceeded straight home. Although Jason was able to calm M.H. within a few minutes, he became very concerned when he found a bump on her head. He called Kristin again and told her he wanted to take M.H. to the hospital. Kristin agreed and met Jason at their house just as he was preparing to leave.

Kristin and Jason took M.H. to Hardin Memorial Hospital, where she was seen by Dr. Gruber. Dr. Gruber testified that Jason's explanation of the events was credible and entirely consistent with M.H.'s injuries. He did not suspect any form of child abuse. However, because M.H. had sustained some significant head trauma, Dr. Gruber ordered that she be transferred to

Kosair Children's Hospital in Louisville for specialty treatment. After arrival at Kosair, M.H. was seen by numerous physicians and extensive radiology was conducted. Two physicians with the University of Louisville Division of Pediatric Forensic Medicine, Drs. Pfitzer and Currie, reviewed M.H.'s test results; it appears they never treated M.H. or spoke with the Humphreys.

Drs. Pfitzer and Currie are required by law to report any potential child abuse to the proper state agency. After reviewing the test results, the two issued the following opinion:

> It is possible that if the child fell six feet onto linoleum floor she could have a skull fracture with associated scalp swelling and the underlying subdural hemorrhage. However, the severity (particularly the amount of separation of the fractured bones) of this fracture is significantly more than what we typically see with accidental falls. Further, the bleeding inside her head is not limited to the area of impact. It is scattered throughout the cranium. This implies a more global head injury that [sic] a simple contact fall. Also, given the concerning radiological impression as cited, a thorough investigation is warranted. In addition, there are unexplained rectangular petechial marks on the baby's arm that imply that she sustained some sort of blunt trauma to that area. It is difficult to understand how a child could suck on her own arm and create a rectangular-shaped lesion.[2]

After receiving the opinion, the agency assigned Sapp to investigate. Sapp never spoke with Dr. Pfitzer and, when called to testify before the ALJ, Dr. Pfitzer stated that she could not give an opinion whether M.H.'s injuries were more likely than not non-accidental.

Sapp is required by law to investigate all claims of potential child abuse assigned to her. She interviewed the Humphreys individually and their recollection of the events remained consistent throughout. Along with a Kentucky State Police Trooper assigned to investigate for criminal purposes, she spoke with a Dr. Moriarty at Kosair. Sapp claims that Dr. Moriarty and

---

[2] The Humphreys agree that M.H. had rectangular marks on her arms when she was admitted to Kosair. They informed the physicians that M.H. sucked on her arms, leaving the marks. At the hearing before the ALJ, a physician testified on behalf of the Humphreys that this explanation was entirely consistent with the marks and, moreover, the marks were inconsistent with abuse. Dr. Pfitzer, the only physician testifying on behalf of the state, did not dispute those findings.

3

an MRI technician agreed that the injuries were more severe than would be expected from an accidental fall. The state trooper came away from the discussion with Dr. Moriarty differently; he claims that Dr. Moriarty shook his head when told about Dr. Pfitzer's conclusion and stated, "that's certainly her opinion." Further, the trooper testified that Dr. Moriarty stated that the Humphrey's explanation was certainly plausible. Dr. Moriarty did not testify before the ALJ.

Sapp spoke with other hospital officials in her investigation. She claims that Dr. Currie informed her that M.H.'s injuries were consistent with shaken baby syndrome, although she agrees that no doctor directly told her the baby had been shaken. She also received a report from an ophthalmologist indicating that a retinal examination showed no signs of shaken baby syndrome.

After conducting this initial investigation, Sapp decided she should take action. Pursuant to KRS § 620.060, she sought and was granted an Emergency Custody Order, which allows for the immediate removal of children from their parents when there are reasonable grounds to believe the children are in danger of imminent death or serious physical harm. To get such an emergency order, Sapp filed an affidavit presenting the evidence she had discovered, particularly the report from Drs. Currie and Pfitzer and the statement from Dr. Currie that M.H.'s injuries were consistent with shaken baby syndrome. Sapp did not inform the court of the ophthalmology report. Based on the emergency order, Sapp took both children into state custody.

KRS § 620.080 provides that when a child is removed from a parent pursuant to an emergency custody order, a temporary removal hearing must be held within 72 hours. Here, such a hearing was held the day after the emergency order was entered. At that hearing, Sapp

4

introduced the same evidence, including the statement that M.H.'s injuries were consistent with shaken baby syndrome. The Court asked the Humphreys if they were willing to stipulate that probable cause existed to suspect abuse. The Humphreys claim that they were given two options: (1) stipulate to probable cause and have the children returned to the family home with Kristin on the condition that Jason move out of the house pending final resolution of the case; or (2) have the children taken into state custody until the final resolution of the case. Given this ultimatum, the Humphreys chose to stipulate to probable cause. Thereafter, the Court determined that probable cause existed and entered a Temporary Custody Order returning the children to the custody of Kristin on the condition that Jason move out of the house and one of Kristin's relatives, either her mother or sister, move in to the house.

For several months, the Temporary Custody Order remained in effect and Sapp continued her investigation. She conducted a few in-home visits with Kristin and the children and visited Jason. Kristin and her relatives claim that during those visits Sapp continually asserted that Jason was "guilty" and that Kristin "would thank" Sapp for her work. Eventually, the Temporary Custody Order was "informally adjusted," as permitted by KRS § 620.140. Under that settlement, the Court neither confirmed nor rejected the allegations of abuse, but Jason was permitted to return home and the case was dismissed.

Sapp was admittedly upset with the "informal" resolution of the claims. She subsequently decided to "substantiate" her allegation of abuse against Jason pursuant to 922 KAR 1:470. "Substantiation" of allegations simply indicates a finding by the Cabinet that it is more likely than not that the accused abused or neglected a child. Once the allegations are substantiated, the accused has an immediate right to appeal the decision. If the substantiation is

affirmed on appeal, then the accused's name is filed on a central registry of individuals for whom abuse allegations have been substantiated. The person's name remains on that registry for a minimum of seven years.

Jason Humphrey immediately pursued his right to appeal Sapp's substantiation of child abuse. Following a hearing, the ALJ reversed the substantiation, finding that Sapp's allegations lacked credibility and that the evidence clearly supported Jason's description of the events leading to M.H.'s injuries. It appears that this resolution ended the Humphreys's struggle with the Cabinet and that all claims were resolved in favor of the Humphreys.

## II.

When a motion to dismiss is filed under Rule 12(b)(6), the Court must look to the Complaint and determine whether it states a claim for which relief is available. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1549 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). From the allegations of the Complaint, the Court must be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a Complaint need not contain "detailed factual allegations," *Twombly*, 550 U.S. at 555, it must contain "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S.Ct. at 1549. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.

The Humphreys's Complaint sets forth two counts, one based on federal law and one

based on state law. Under Count I, the Humphreys allege a cause of action based on 42 U.S.C. § 1983. More specifically, they claim: (1) their children were unlawfully removed from their home; (2) their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures were violated by Defendants; and (3) they were deprived of property without due process of law in violation of their Fifth and Fourteenth Amendment rights. The Complaint does not specify what actions of Defendants give rise to these claims. However, several acts are alleged in the "Facts" section of the Complaint. The Court will discuss each of those acts and determine whether any liability plausibly exists.

As a general matter, the Sixth Circuit has said that social workers have absolute immunity when acting in the capacity of legal advocates, which includes initiating court proceedings and testifying under oath. *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) Thus, it is important to remember that in the case of social workers, "absolute immunity is determined by a functional analysis that looks to the nature of the function performed, not the identity of the actor who performed it." *Id.* at 774. Therefore, the Court will pay particular attention to the acts alleged in the complaint.

**A.**

First, the Complaint alleges that "physicians and other medical personnel" at Kosair Children's Hospital performed non-medically necessary testing as agents of the state. (Complaint ¶¶ 12-13.) There are no allegations, however, that Sapp or Bartley requested these tests be done or were even involved in this case before the testing was completed. In fact, the ALJ opinion shows that Sapp only became involved as a result of the findings of the tests. Thus, the medical testing cannot be a basis for Count I of the Complaint against Sapp and Bartley.

**B.**

Next, the Humphreys allege that "[o]n or about April 30, 2008, Defendant, Kim Sapp, petitioned the Hardin County, Kentucky, Family Court for removal of MH and LH from their parents, Jason and Kristin Humphrey." (Complaint ¶ 16.) To the extent this action is the basis of Count I, Sapp is undeniably protected by quasi-prosecutorial absolute immunity. The Sixth Circuit has clearly stated that "family service workers [are] absolutely immune from liability in filing [a] juvenile abuse petition, due to their quasi-prosecutorial function in the initiation of child abuse proceedings." *Salyer v. Patrick*, 874 F.2d 374, 378 (6th Cir. 1989); *see also Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (finding that social workers who initiate child neglect proceedings by filing a petition in state court on behalf of a child are entitled to absolute immunity). The Humphreys offer no basis for a different conclusion here; they agree that Sapp initiated the court proceedings.

**C.**

The Humphreys also allege, "On or about April 30, 2008, based upon false sworn testimony of Defendant, Kim Sapp, the Hardin County, Kentucky, Family Court removed MH and LH from their parents, Jason and Kristin Humphrey." (Complaint ¶ 17.) There are two facts in this allegation that could form the basis of Count I: (1) Sapp's removal of the children from the Humphreys's custody, or (2) Sapp's giving "false sworn testimony" to the family court. To the extent Count I is premised on the actual removal of the children, Sapp's absolute immunity bars such a claim. "[A] CPS worker [is] accorded absolute quasi-judicial immunity from liability for damages stemming from the worker's apprehension of a child pursuant to a valid

8

court order." *Coverdell v. Dep't of Soc. and Health Serv., State of Washington*, 834 F.2d 758, 765 (9th Cir. 1987); *see also Bush v. Rauch*, 38 F.3d 842, 848 (6th Cir. 1994) (holding that officials are entitled to absolute immunity when executing court orders, citing *Coverdell*).

### D.

The Humphreys's allegation that Sapp presented false testimony at the custody hearing requires more analysis. The Complaint is not specific as to which evidence presented by Sapp was false. Based on the ALJ's findings, the only apparent basis for such an allegation is Sapp's indication to the court that M.H.'s injuries were consistent with shaken baby syndrome and Sapp's decision not to present the results of the ophthalmology test indicating M.H. was not a shaken baby.

Even assuming the worst (i.e. that Sapp purposefully withheld evidence contradicting Dr. Currie's original statement that M.H.'s injuries were consistent with shaken baby syndrome), the actions complained of are protected by absolute immunity under Sixth Circuit precedent. "[S]ocial workers are absolutely immune only when they are acting in their capacity as legal advocates - initiating court actions or *testifying under oath* - not when they are performing administrative, investigative, or other functions." *Holloway*, 220 F.3d at 775 (original emphasis removed, new emphasis added). The actions the Sixth Circuit specified as protected are the exact actions allegedly engaged in by Sapp. Moreover, the decision of a prosecutor or social worker relating to what evidence to present or withhold in a hearing is entitled to absolute immunity. *See id.* at 776.

The fact that the Humphreys allege that Sapp's testimony was false does not change this result. Absolute immunity for social workers is analyzed under the same principles as absolute

9

immunity for prosecutors. The U.S. Supreme Court has observed that such immunity applies to prosecutors "eliciting false or defamatory testimony from witnesses or . . . making false or defamatory statements during and related to judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993). Such a rule may seem wrong because it may give prosecutors *carte blanche* to engage in unethical behavior and deny a remedy to those harmed. The Supreme Court has determined, however, that "it is better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Burns v. Reed*, 500 U.S. 478, 484 (1991) (quotation omitted). Moreover, the Court has noted that alternative judicial procedures are available to ensure a fair trial and result for the accused despite his inability to seek civil liability against the prosecutor. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). Such alternative remedies were available here and appear to have been successful. The Humphreys agree that their family has been reunited and the allegations of abuse have been resolved in their favor.[3]

Despite the apparent application of absolute immunity, the Humphreys ask the Court to hold Sapp liable under the principle annunciated in *Kalina v. Fletcher*, 522 U.S. 118 (1997). There, the Supreme Court found that a prosecutor was entitled to absolute immunity for her conduct in connection with the preparation and filing of charging documents, but was not entitled to absolute immunity for her actions in affirming the truth of statements contained in a

---

[3] The Court recognizes that the Sixth Circuit, in dicta, has stated "[Absolute] immunity extends to unintentional errors in the petition [to remove children from their parents' custody]." *Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001). In theory, such a statement could imply that an intentional misrepresentation in a petition is not protected by absolute immunity. However, the Circuit has never affirmatively made such a statement. More importantly, any such finding would clearly contradict the Supreme Court's analysis of prosecutorial immunity and undermine the policy reasons for applying absolute immunity. This Court finds no basis upon which to treat absolute immunity for social workers who file judicial petitions differently than absolute immunity for prosecutors who take the same action.

certification of facts establishing probable cause. The state of Washington's Criminal Rules required that "an arrest warrant be supported by an affidavit or sworn testimony establishing the grounds for issuing the warrant." *Id.* at 121 (quotation omitted). In *Kalina*, the prosecutor filed a charging document seeking an arrest warrant. She accompanied that document with a certification laying out the evidence against the defendant. The Supreme Court was clear that simply filing the certification of evidence would have been protected by absolute immunity. *Id.* at 129. However, the prosecutor took an extra step by personally attesting to the truth of the averments in the certification. *Id.* It was that extra step alone that was not protected by absolute immunity because the prosecutor was taking the role of a complaining witness, not a legal advocate. *Id.*

The Complaint here alleges merely that Sapp provided "false sworn testimony." It is clear from the ALJ's opinion that Sapp informed the Court that she had been told by Dr. Currie that M.H.'s injuries were consistent with shaken baby syndrome and that she believed the children were in danger because M.H. had injuries consistent with shaken baby syndrome. There are no allegations that Sapp personally affirmed the truth of these statements. In fact, Sapp would have had absolutely no qualifications to personally affirm such statements; she is not a medical doctor and performed no tests to personally determine whether M.H. had been shaken. Her "testimony" regarding shaken baby syndrome was nothing more than the act of a prosecutor presenting hearsay evidence to the Court to obtain an arrest or search warrant; she did not serve as a "complaining witness." Under such an analysis, *Kalina* appears inapplicable.

Moreover, the Sixth Circuit has stated, after the *Kalina* opinion was issued, that social workers are entitled to absolute immunity for " initiating court actions or *testifying under oath*."

11

*Holloway*, 220 F.3d at 775 (emphasis added). In fact, the *Holloway* opinion cites *Kalina* in its discussion of absolute immunity for social workers and proceeds to state that social workers are entitled to absolute immunity for *testimony*. Indeed, the Humphrey's argument was presented to the Sixth Circuit in *Meyers v. Franklin County Court of Common Pleas*, 81 Fed. Appx. 49 (6th Cir. 2003), and the Circuit affirmed absolute immunity. In *Meyers*, the defendant, China Widener, appeared before a Juvenile Court to seek the removal of the plaintiff's daughter from her custody. Widener "presented neither witnesses nor affidavits in support of her case." *Id.* at 51. Rather, and much like Sapp in this case, Widener

> argued that [the child] should immediately be returned to the temporary custody of the [state], because [the child] had approximately doubled her weight since her return to her mother. Widener also noted that [the child] was suffering from high blood pressure, that [her] doctor had recommended that [she] be removed from the home, and there was "information" that [the child and mother] were using cocaine.

*Id.* at 52. The plaintiff in *Meyers* argued that Widener's "testimony" to the court regarding the child's physical condition and the information conveyed to her by doctors was like the affirmation of the prosecutor in *Kalina* and, therefore, was not entitled to absolute immunity. The Circuit rejected the argument, holding that "[t]he district court properly found that Widener was entitled to absolute immunity for her role in this case." *Id.* at 54. Given the Sixth Circuit's application of *Kalina* to social workers (or lack thereof), this Court finds that Sapp is entitled to absolute immunity for her actions in presenting evidence and "testifying" to the family court.

### E.

The final action that the Humphreys allege is that "even after the rejection of the Family Court matter and despite the lack of evidence and probable cause Defendants Kim Sapp, Jamey Bartley and the Commonwealth of Kentucky continued their pursuit of Plaintiffs." Again, the

12

Complaint does not specify the factual basis for this averment. The Court assumes that this is a reference to Sapp's decision to substantiate the allegation of abuse against Jason Humphrey. Such an action is not protected by absolute immunity. *See Achterhof v. Selvaggio*, 886 F.2d 826 (6th Cir.1989) (finding that a social worker's decision to open an investigation and place a father's name on a central registry was not entitled to absolute immunity). However, Sapp's decision to substantiate abuse does not seem to support any of the Humphreys's legal claims under Count I.

The decision to substantiate abuse cannot support the Humphreys's Fourth and Fourteenth Amendment claims. There are no allegations that Defendants searched or seized anything as a part of Sapp's substantiation. Without such allegations, the Fourth and Fourteenth Amendment claims are nothing more than "labels and conclusions . . . [that] will not do." *Iqbal*, 129 S.Ct. at 1549 (quoting *Twombly*, 550 U.S. at 555).

Likewise, the decision to substantiate abuse does not support the Humphreys's "deprivation of property without due process of law" claim. Again, the Complaint does not set forth in any detail what property was actually taken from the Humphreys. It appears that Sapp's decision to substantiate abuse against Jason Humphrey did not result in the deprivation of any property. To be certain, the state did not directly take anything belonging to the Humphreys as a result of the decision. Moreover, there is no indication of how due process was lacking; before any action was taken, the Humphreys successfully appealed the substantiation. Tellingly, in their Response to Defendants' Motion to Dismiss, the Humphreys assert that they "will also be requesting leave of Court to amend the Complaint to assert claims for malicious prosecution for the wrongful administrative action." No such request has been filed. This statement in the

Response indicates (1) that Count I is not based on Sapp's substantiation of abuse, and (2) the claim the Humphreys believe is related to substantiation is a state law claim for malicious prosecution.[4] The substantiation of abuse, therefore, cannot support the Humphreys's Fifth and Fourteenth Amendment claims.

Because the Court finds that Sapp is entitled to absolute immunity for most of her actions and her remaining actions do not support the Humphreys's claims under Count I, the Court will dismiss that count, in its entirety, with prejudice.[5]

**IV.**

The remainder of the Humphreys's claims are based on state law. The Court has only supplemental jurisdiction under 28 U.S.C. § 1367 for those claims. That statute provides, "The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." This case presents the quintessential circumstances where declining supplemental jurisdiction following a dismissal of all federal claims is appropriate.

Although the decision to decline or exercise supplemental jurisdiction rests squarely in

---

[4] In *Albright v. Oliver*, 510 U.S. 266 (1994), the Supreme Court held that substantive due process rights under the Fifth Amendment do not support a federal claim for malicious prosecution. Rather, that claim is a state law tort claim.

[5] The only allegation against Bartley is that Sapp informed her of her decision to bring a petition for custody and he approved of her decision. The absolute immunity extended to Sapp for her decision to bring such a petition must logically extend to Bartley, her alleged supervisor, for approving it. *See Van de Kamp v. Goldstein*, 129 S.Ct. 855, 862 (2009) ("We reach this conclusion by initially considering a hypothetical case that involves supervisory or other office prosecutors but does not involve administration. Suppose that Goldstein had brought such a case, seeking damages not only from the trial prosecutor but also from a supervisory prosecutor or from the trial prosecutor's colleagues-all on the ground that they should have found and turned over the impeachment material about Fink. *Imbler* makes clear that all these prosecutors would enjoy absolute immunity from such a suit. The prosecutors' behavior, taken individually or separately, would involve "[p]reparation ... for ... trial," 424 U.S., at 431, n. 33, 96 S.Ct. 984, and would be "intimately associated with the judicial phase of the criminal process" because it concerned the evidence presented at trial. *Id.*, at 430, 96 S.Ct. 984. And all of the considerations that this Court found to militate in favor of absolute immunity in *Imbler* would militate in favor of immunity in such a case.").

14

the Court's discretion, the Sixth Circuit has offered guidance. "A district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Moreover, the Circuit "has held that generally, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.* (quotation omitted).

Here, the case is in its infancy. It was filed April 29, 2009 and the motion to dismiss on behalf of the commonwealth and official capacity defendants was filed on May 26, 2009. The pending motion to dismiss was filed August 4, 2009. An answer to the Complaint has yet to be filed and no discovery has been conducted by the Humphreys. Although nearly a year has passed since the case was filed, much of the delay was caused by the parties' requests for extensions of time to respond and reply to the motions to dismiss, which this Court granted. Little work has been done to develop or further the state law claims in this Court. Thus, there will be no prejudice to either party, no duplication of judicial resources and no multiplicity of litigation if the Court declines supplemental jurisdiction and the Humphreys file their state law claims in state court.

More important, the underlying nature of this case is of critical importance to the State. Few issues are more strongly related to state interests than the proper functioning of child custody decisions. As the Supreme Court has stated,

> Long ago we observed that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593-594, 10 S.Ct. 850, 34 L.Ed. 500 (1890). *See also Mansell v. Mansell*, 490 U.S. 581, 587, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989) ("[D]omestic relations are preeminently matters of state law"); *Moore v. Sims*, 442 U.S. 415, 435, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) ("Family

> relations are a traditional area of state concern"). So strong is our deference to state law in this area that we have recognized a "domestic relations exception" that "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). We have also acknowledged that it might be appropriate for the federal courts to decline to hear a case involving "elements of the domestic relationship," *id.*, at 705, 112 S.Ct. 2206, even when divorce, alimony, or child custody is not strictly at issue . . . Thus, while rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, *see, e.g., Palmore v. Sidoti*, 466 U.S. 429, 432-434, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts.

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12-13 (2004). While this case does not involve the "domestic relations exception" that prohibits federal jurisdiction, it does involve important issues of state law related to child custody decisions. The Court, therefore, believes it prudent to decline supplemental jurisdiction and leave those important state law questions for the state courts.[6]

The Court will issue an order consistent with this Memorandum Opinion.

cc: Counsel of Record

---

[6] It should be noted that any statute of limitations for a state court action based on the claims presented here is deemed tolled during the pendency of this suit and for a minimum of 30 days after the Court's Order declining supplemental jurisdiction. *See* 28 U.S.C. § 1367(d).